UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

BRAINTREE LABORATORIES, INC.,          *
and AFFORDABLE                         *
PHARMACEUTICALS, LLC,                   *
                                        *
        Plaintiffs,                     *
                                        *
            v.                          *          Civil Action No. 16-cv-11936-IT
                                        *
BEDROCK LOGISTICS, LLC,                 *
                                        *
        Defendant.                      *
*****************************************
BEDROCK LOGISTICS, LLC,                 *
                                        *
        Counterclaim Plaintiff &        *
        Third-Party Plaintiff,          *
                                        *
            v.                          *
                                        *
BRAINTREE LABORATORIES, INC.,          *
and AFFORDABLE                         *
PHARMACEUTICALS, LLC,                   *
                                        *
        Counterclaim Defendants,        *
                                        *
            v.                          *
                                        *
JAMES SEARS and HENRY                  *
VILLALOBOS,                             *
                                        *
        Third-Party Defendants.         *
*****************************************
JAMES SEARS,                            *
                                        *
        Third-Party Counterclaim Plaintiff,  *
                                        *
            v.                          *
                                        *
BEDROCK LOGISTICS, LLC,                 *
                                        *
        Third-Party Counterclaim Defendant.  *

MEMORANDUM & ORDER

August 28, 2018

TALWANI, D.J.

Pharmaceutical companies Braintree Laboratories, Inc., and Affordable Pharmaceuticals, LLC (collectively, "Braintree") filed this action against transportation logistics provider Bedrock Logistics, LLC ("Bedrock"), alleging that one of Bedrock's sales agents, James Sears, made kickback payments to one of Braintree's employees, Henry Villalobos, to secure Braintree's purchase of Bedrock's services. Bedrock filed counterclaims against Braintree to collect on unpaid invoices, and third-party claims against Sears and Villalobos. Sears filed third-party counterclaims against Bedrock. Six motions are currently pending. For the reasons set forth below, Bedrock's <u>Motion for Summary Judgment on all of Plaintiffs' Claims</u> [#128] is DENIED, Villalobos' <u>Motion for Summary Judgment</u> [#123] and Sears' <u>Motion for Summary Judgment on Bedrock's Third-Party Claims</u> [#132] are DENIED in part and ALLOWED in part, Bedrock's <u>Motion for Summary Judgment on All of James Sears' Claims</u> [#130] is ALLOWED, and Bedrock's <u>Motion to Strike the Declaration of David M. Bovet</u> [#155] and <u>Motion to Strike Portions of the Declaration of Philip Rakhunov</u> [#154] are DENIED as moot.

I.      <u>Summary Judgment Standard</u>

Summary judgment is appropriate only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A dispute is genuine if the evidence about the fact is such that a reasonable jury could resolve the point in the favor of the non-moving party. A fact is material if it has the potential of determining the outcome of the litigation." <u>Patco Constr. Co. v. People's United Bank</u>, 684 F.3d 197, 206-07 (1st Cir. 2012) (internal quotations and citations omitted). In resolving a motion for summary judgment, the court views all properly supported evidence in the light most favorable to the non-movant and draws all reasonable inferences in the non-

movant's favor. <u>Griggs-Ryan v. Smith</u>, 904 F.2d 112, 115 (1st Cir. 1990).

II.     <u>Background</u>

In light of the summary judgment standard, this background section outlines the relevant facts that are either undisputed as set forth in the parties' Local Rule 56.1 statements of undisputed material fact and responses or not properly disputed for purposes of summary judgment under Federal Rule of Civil Procedure 56(c) or (e)(2). Additionally, where genuine disputes of fact do arise, the court sets forth the properly supported evidence in the light most favorable to the non-movants on each of the pending motions.[1]

a.     *The Parties*

Braintree develops, manufactures, and distributes various pharmaceutical products. Bedrock's Responses to Braintree's Additional Statements of Undisputed Material Facts ("Bedrock's Resps. to Braintree's Add'l SOF") ¶ 1 [#158]. Braintree ships its products nationally from its facilities in Massachusetts. <u>Id.</u> ¶ 2.

Bedrock, a shipping logistics provider, negotiates contracts with carriers and then sells

---

[1] Bedrock has filed a <u>Motion to Strike Portions of the Declaration of Philip Rakhunov</u> [#154], seeking to strike one paragraph for lack of personal knowledge and various exhibits attached to Braintree's counsel's declaration based on authentication, hearsay, and other issues. Bedrock has also filed a <u>Motion to Strike the Declaration of David M. Bovet</u> [#155], in which it argues that Bovet's declaration should be stricken because, among other reasons, it is not based on sufficient facts and data and is not the product of reliable principles or methods. The court notes that Bedrock failed to comply with Local Rule 7.1(a)(2)'s requirement that "[n]o motion shall be filed unless counsel certify that they have conferred and have attempted in good faith to resolve or narrow the issue." This noncompliance "alone would be reason enough to deny [Bedrock's] motion[s]." <u>Martinez v. Hubbard</u>, 172 F. Supp. 3d 378, 383 (D. Mass. 2016). In any event, the court has reached the dispositions in this order without relying on the Bovet Declaration or on the exhibits or portions of the Rakhunov Declaration challenged by Bedrock, either because the material in those exhibits is not necessary to a determination of the motions for summary judgment, or because that material appears elsewhere in the summary judgment record. Accordingly, the <u>Motion to Strike Portions of the Declaration of Philip Rakhunov</u> [#154] and the <u>Motion to Strike the Declaration of David M. Bovet</u> [#155] are DENIED as moot.

these transportation services to customers. Rakhunov Decl. Ex. 15 (Schaetzl Dep.) 79:1-16 [#147-15]. Bedrock connects customers to Bedrock's Transportation Management System ("TMS") software, which lists the shipping rates available to the customer for various carriers based on location, delivery time, and type of shipment. Bedrock's Resps. to Braintree's Add'l SOF ¶ 26 [#158]. Bedrock calculates its TMS rates by adding the rates carriers charge Bedrock to Bedrock's sales margins (neither of which Bedrock discloses to its customers). Rakhunov Decl. Ex. 15 (Schaetzl Dep.) 109:2-12 [#147-15]. Bedrock's sales margins vary customer-by-customer, and range from fifteen to forty percent of the carrier rate. Id. at 107:14-15.

Starting in the early 1990s, James Sears acted as an outside agent who connected Braintree with logistics providers. Villalobos' Statement of Undisputed Material Fact (hereinafter "Villalobos' SOF") Ex. A (Villalobos Dep.) 70:9-12 [#125-1]; id. Ex. B (Sears Dep.) 18:13-17 [#125-2]. Beginning in December 2007, Henry Villalobos served as Braintree's shipping manager. Villalobos' SOF ¶ 2 [#125]. In this role, Villalobos was responsible for deciding which shipping logistics services Braintree should use. Id.

b. *Beginning of the Braintree-Bedrock Relationship*

In early 2012, Sears was approached by Bedrock about taking on a role as one of Bedrock's sales agents. Rakhunov Decl. Ex. 10 (Sears Dep.) 16:1-9, 147:14-21. Sears agreed to serve as Bedrock's agent for Braintree's shipping needs, and Bedrock agreed to pay Sears a commission equal to forty-to-fifty percent of Bedrock's share of revenue for Braintree's shipments. Bedrock's Mot. Summ. J. on Sears' Claims Ex. 1 (Sears Dep.) 37:11-15 [#130-2].

Sears promptly contacted Villalobos to introduce Braintree to Bedrock's services. Rakhunov Decl. Ex. 6 (Villalobos Dep.) 76:10-11 [#147-6]. A February 9, 2012, email from Sears to Villalobos, which also copied Bedrock's President, Charles McCabe, stated, "Henry,

We would like to meet this afternoon at some point. Chuck [McCabe] would ideally like to take you out after work. We need to address some concerns of yours and more importantly dispel[] some concerns not based on fact." Villalobos' SOF Ex. D (February 2012 Sears Email) [#125-4]. Sears and McCabe met with Villalobos soon thereafter to discuss how Braintree could benefit from using Bedrock's services. Rakhunov Decl. Ex. 6 (Villalobos Dep.) 76:13-25 [#147-6].

In the early weeks of the relationship between Braintree and Bedrock, McCabe and Sears provided entertainment to Villalobos, including multiple expensive dinners. Rakhunov Decl. Ex. 10 (Sears Dep.) 78:1-11, 114:5-11 [#147-10]. For example, McCabe, Sears, Villalobos, and Villalobos' wife went for "a thousand dollar night out." Id. at 78:1-11. According to Sears, Villalobos quipped the day after that dinner that he would "rather have the money." Id. McCabe, Sears, and Villalobos went out for roughly five or six such dinners. Id. at 114:6-7. Subsequently, Sears and Villalobos formed an arrangement whereby Sears would pay Villalobos for each shipment Braintree made using Bedrock's services, so long as Villalobos used Bedrock for a certain number of shipments each month. Villalobos' SOF Ex. A (Villalobos Dep.) 151:8-15 [#125-1]. McCabe instructed Sears to make the payments to Villalobos from Sears' personal accounts rather than from any Bedrock-associated accounts. Rakhunov Decl. Ex. 10 (Sears Dep.) 123:16-124:3 [#147-10].[2]

c. *Braintree Uses Bedrock's TMS*

Villalobos made the decision that Braintree would begin purchasing Bedrock's transportation logistics services, including use of its TMS. Bedrock's Mot. Summ. J. on Braintree's Claims Ex. 1 (Villalobos Dep.) 79:2-7 [#128-2]. When asked how he reached this

---

[2] At the hearing on the motions for summary judgment, Bedrock conceded that there is no evidence in the record to dispute that Sears told McCabe about Sears' payment arrangement with Villalobos in 2012, while McCabe was still President of Bedrock. Tr. of August 6, 2018, Hr'g 5:17-6:6 [#171].

decision, Villalobos testified that, in his view, "[a]t the time what they proposed was pretty attractive . . . . " Id. Further, Villalobos testified that Bedrock's TMS was easy to use. Id. at 79:11-17. Villalobos also testified that he decided Braintree should use Bedrock as its transportation broker before Bedrock proposed any pricing, and therefore before Villalobos could determine whether Bedrock was providing better pricing than its competitors. Id. at 79:18-23. Ultimately, Bedrock provided its proposed pricing, and Villalobos determined that it was "competitive." Id. at 80:3.

To use Bedrock's TMS software, Villalobos inputted the destination zip code of a shipment, the weight, and the number of pieces or pallets, and then clicked next on the screen. Bedrock's Mot. Summ. J. on Braintree's Claims Ex. 1 (Villalobos Dep.) 18:3-8 [#128-2]. The TMS then provided a list of rates from the carriers with whom Bedrock had contracted. Id. at 18:9-11. Villalobos selected from this list which carrier Braintree would use for a specific shipment. Id. at 18:12-14. Villalobos was the only Braintree employee who used the TMS software. Bedrock's Resps. to Braintree's Add'l SOF ¶ 23 [#158].

At times, Villalobos selected carriers other than those in Bedrock's TMS. Bedrock's Mot. Summ. J. on Braintree's Claims Ex. 1 (Villalobos Dep.) 58:15-18 [#128-2]. Villalobos did so based on factors including service, pricing, customer preference, and location. Id. at 143:11-17, 144:6-11.

Part of Villalobos' job required him to verify freight invoices sent to Braintree after completion of a shipment. As Villalobos explained, each week he compared rates listed on freight invoices to the prices displayed on the TMS. Rakhunov Decl. Ex. 6 (Villalobos Dep.) 93:3-7, 146:6-7 [#147-6]; Bedrock's Mot. Summ. J. on Braintree's Claims Ex. 1 (Villalobos Dep.) 45:2-3 [#128-2]. If the TMS displayed a rate different than that appearing on a particular

invoice, Villalobos disputed that invoice. Id. at 46:16. Sometimes Bedrock assisted Braintree in such disputes. Id. at 46:17-20. Braintree General Counsel Robert Raleigh testified that freight invoices went through multiple layers of review by both Villalobos and other shipping department employees. Bedrock's Mot. Summ. J. on Braintree's Claims Ex. 5 (Raleigh Dep.) 37:10-23 [#128-6]. If approved, invoices were sent to accounts payable. Id.

Villalobos was also responsible for reviewing Bedrock's pricing to ensure it was competitive. Bedrock's Mot. Summ. J. on Braintree's Claims Ex. 5 (Raleigh Dep.) 198:4-9 [#128-6]. An employee who worked under Villalobos' direction assisted him for a time. Id. at 198:10-14. However, Villalobos testified that during the period that Braintree used Bedrock as its "house carrier," Villalobos did not price other logistics providers to see whether they could offer a better deal to Braintree. Rakhunov Decl. Ex. 6 (Villalobos Dep.) 83:21-25 [#147-6]. At the time, Villalobos explained, he "thought that the pricing in place was very competitive," id. at 84:2-6, but he also acknowledged that, in continuing to use Bedrock, the payments he received from Sears were "part of" his decisionmaking. Id. at 184:16.

       d. *Sears' Payments to Villalobos Continued Through Summer 2016*

Sears made payments to Villalobos monthly with personal checks or cash, using the money he made from the commissions Bedrock paid him on each Braintree order. Bedrock's Resps. to Braintree's Add's SOF Ex. 3 (Sears Dep.) 81:5-11 [#158-3].

William Schaetzl worked as Bedrock's controller[3] and was responsible for commissions and accounts receivables for Bedrock's outside sales representatives. Sears' SOF in Support of Mot. Summ. J. on Bedrock's Claims (hereinafter "Sears' SOF") Ex. F (Schaetzl Dep.) 128:14-

---

[3] According to Bedrock, Schaetzl actually worked as the company's freight bill auditor, not as its controller, see Bedrock's Responses to Sears' SOF ¶ 5 [#160], even though Schaetzl's signature line on various emails in the record identify him as Bedrock's controller, see, e.g., Sears' SOF Ex. A (June 2012 Emails) [#134-1].

23, 193:17-19 [#134-6]. On June 26, 2012, Sears emailed Schaetzl that "Henry, Braintree [L]abs, would like to get paid for all the invoices that he has paid thus far, basically thru June. I am leaving on vac. for 2 weeks [S]unday. Can we meet thursday/fri for commissions due? If not, let me know how many bills he has paid and I will front it for now." Sears' SOF Ex. A (June 2012 Emails) [#134-1].

On October 1, 2013, Villalobos emailed Sears the following message: "Please see email below for Bedrock payments for the month of September. As you can see we've been paying Bedrock on a consistent basis for the month of September. Is there any way I can get paid possibly Thursday or Friday of this week or on Monday of next week?" Sears' SOF Ex. B (October 2013 Emails) [#134-2]. Sears forwarded this email to Schaetzl. Id.

Bedrock terminated McCabe in February 2014. Rakhunov Decl. Ex. 9 (Sears Aff.) ¶ 2 [#147-9]. After his termination, McCabe called Sears and relayed certain information, recounted here not for its truth but as the statements that Sears subsequently sought to confirm. Sears reports that McCabe stated that he wanted to discuss "keeping the 'team' together." Id. McCabe told Sears that McCabe had met with Bedrock Vice President of Sales William Luckett and Bedrock Truckload Division Manager Mitch Getchell in Florida. Id. ¶ 3. McCabe also told Sears that McCabe was going to try to recruit Luckett to work for another logistics provider called Pursuit Logistics. Rakhunov Decl. Ex. 10 (Sears Dep.) 125:2-6 [#147-10]. McCabe told Sears that McCabe had told Luckett and Getchell that he was going to take all of Bedrock's business and tell Braintree about the payments, id., and that McCabe would move the Braintree account from Bedrock to Pursuit Logistics. Rakhunov Decl. Ex. 9 (Sears Aff.) ¶ 4 [#147-9]. McCabe said Luckett "threatened that he would expose the payment arrangements between [Sears] and Villalobos if the Braintree business was moved to Pursuit Logistics." Id.

Sears called Getchell to confirm McCabe's account. Id. ¶ 5. Getchell told Sears that McCabe and Luckett "got in a fight over accounts at dinner. [McCabe] informed Luckett he would be taking all Bedrock accounts with him to Pursuit Logistics. Luckett responded with, I will go to Braintree Labs and expose Jim and Henry's payment arrangement." Id. Sears also testified that he called Schaetzl, who confirmed that he knew of the dispute between McCabe and Luckett during the Florida meeting. Id. ¶ 8. Schaetzl told Sears that he believed Luckett would follow through on his threat to expose Sears' payment scheme. Id.

After Sears spoke with McCabe, Getchell, and Schaetzl, Sears called Luckett. Bedrock's Opp'n to Villalobos' Mot. Summ. J. Ex. 5 (Sears Dep.) 226:12-24 [#142-5]. Sears asked Luckett whether McCabe said anything to Luckett about Sears and Villalobos' relationship. Id. at 227:2-8. Luckett said he did not "want to know anything about" that relationship. Id.

Shortly after McCabe's February 2014 termination from Bedrock, Villalobos explored options for transferring Braintree's shipping logistics business from Bedrock to Pursuit Logistics. Rakhunov Decl. Ex. 6 (Villalobos Dep.) 84:7-15 [#147-6]. On March 13, 2014, Schaetzl and Luckett received an email from a carrier alerting them that Braintree might cancel its relationship with Bedrock. Rakhunov Decl. Ex. 18 (March 2014 Emails) 3 [#147-18]. Luckett forwarded the email to Sears and wrote, "Jim, Are we no longer to handle? Didn't know anything about this? Please let us know." Id. Sears wrote back the next day, asking to talk later. Id. Luckett forwarded Sears' response to Schaetzl and Getchell. Id. at 2. Getchell responded to Luckett that Sears was delaying. Id. Luckett wrote back to Getchell, "Okay with me. I'm loading the birdshot for the golden goose." Id. Getchell responded, "Yup – to quote you . . . Bad move Jimbo." Id.

Ultimately, Braintree decided to stay with Bedrock. According to Villalobos, he stayed with Bedrock "because we already had a relationship." Bedrock's Mot. Summ. J. on Braintree's

Claims Ex. 1 (Villalobos Dep.) 85:4-7 [#128-2].

On April 4, 2014, Sears emailed Villalobos the following message: "I guess I'm going to have to pay you, I already cut the check . . . punk. Please check on what and when they have paid . . . how much?" Sears' SOF Ex. 6 (April 2014 Emails) [#134-7]. Villalobos responded with a list of three payments from Braintree to Bedrock. Id. Sears forwarded this email to Schaetzl and wrote, "Bill, see if and when hq recd these . . . let me know." Id. Schaetzl responded, "[s]ee below for Braintree info. Affordable, the last 2 checks were po[s]ted on 3/12 . . . ." Id.[4]

  e. *Braintree Discovers the Sears-Villalobos Payment Scheme*

In late July or early August 2016, then-former Bedrock President McCabe met with Braintree General Counsel Robert Raleigh. The information McCabe relayed is recounted here not for its truth but for the notice that triggered Braintree's further actions. McCabe told Raleigh that Bedrock was part of a scheme in which one of its agents paid Braintree's shipping manager, Villalobos, to maintain shipping business between Bedrock and Braintree. Bedrock's Resps. to Braintree's Add'l SOF ¶ 34 [#158]; Rakhunov Decl. Ex. 1 (Raleigh Dep.) 47:12-17 [#147-1]. McCabe told Raleigh that he learned while he was President of Bedrock that Braintree was being overcharged and that there was a kickback scheme in place with Braintree's shipping manager. Id. at 50:13-21. McCabe further stated that Luckett and Schaetzl, both still employed by Bedrock, were also aware of the kickback scheme. Id. at 51:2-6. McCabe also told Raleigh that Bedrock had similar schemes with employees at other companies. Id. at 51:14-17.

---

[4] Bedrock maintains that, other than McCabe, no Bedrock employees were aware of the payment scheme between Villalobos and Sears. Bedrock's Resps. to Braintree's Add'l SOF ¶¶ 12, 34 [#158]. In making this assertion, Bedrock relies on deposition testimony from John McNamama, McCabe's successor as Bedrock's president, as well deposition testimony from Luckett and Schaetzl, in which each denies having any knowledge of Sears' payment scheme with Villalobos prior to an August 2016 call from Sears regarding the arrangement. Id. Viewing the evidence in the light most favorable to Braintree, however, there is evidence from which a jury could find that Luckett, Schaetzl, and Getchell knew of the scheme prior to August 2016.

On August 17, 2016, Raleigh arranged a meeting with Villalobos and Braintree CEO Harry Keegan in which Raleigh asked Villalobos whether Bedrock was overcharging Braintree. Bedrock's Mot. Summ. J. on Braintree's Claims Ex. 1 (Villalobos Dep.) 91:14-20 [#128-2]. Villalobos denied any awareness of overcharges, and stated that if Bedrock were overcharging Braintree, Villalobos would find such overcharges in the course of his auditing and would dispute them. Id. at 91:23-92:8. When asked about the payment scheme, Villalobos admitted that he was receiving payments from Sears. Bedrock's Resps. to Braintree's Add'l SOF ¶ 35 [#158]. Raleigh told Villalobos that Braintree was terminating his employment. Rakhunov Decl. Ex. 6 (Villalobos Dep.) 106:24-107:2 [#147-6]. At the time of his termination as Braintree's shipping manager, Villalobos' annual compensation, including his bonus, was roughly $100,000. Id. at 66:13-16.

Upon uncovering the Sears-Villalobos payment scheme, Braintree stopped using Bedrock's services. Bedrock's Resps. to Braintree's Add'l SOF ¶ 44 [#158]. Sears stopped receiving any commissions from Bedrock. This lawsuit followed.

III.     Bedrock's Motion for Summary Judgment on All of Braintree's Claims

Braintree brings the following claims against Bedrock: conspiracy (Count One), aiding and abetting breach of fiduciary duty (Count Two), breach of the duty of good faith and fair dealing (Count Three), violation of M.G.L. ch. 93A (Count Four), and tortious interference (Count Five). See Am. Compl. [#39]. Bedrock's Motion for Summary Judgment on All of Plaintiffs' Claims [#128] raises two arguments: (1) Braintree sustained no damages as a result of any of Bedrock's conduct; and (2) Bedrock's conduct did not interfere with Braintree's contractual relationship with Villalobos or its prospective economic advantage, because Villalobos occasionally selected carriers not offered by Bedrock and has stated that he at all

times tried to select the best carrier for each shipment he placed on Braintree's behalf. For the reasons that follow, genuine disputes of material fact require denial of Bedrock's motion.

a. *Whether Braintree Has Shown Damages Resulting from Bedrock's Conduct*

Braintree must prove damages as an element of each of its claims. Yet Braintree's burden at this stage is not onerous. It must merely show *some* damages. "To survive a motion for summary judgment, the plaintiffs need not prove the precise amount of damages 'with mathematical precision.'" Kuchera v. Parexel Int'l Corp., 719 F. Supp. 2d 121, 128 (D. Mass. 2010) (quoting Coady v. Wellfleet, 816 N.E.2d 124, 131 (Mass. 2004)). "Under Massachusetts law, uncertainty as to the amount of damages does not bar their recovery, but a plaintiff must establish its claim upon a solid foundation in fact, and cannot recover when any essential element is left to conjecture, surmise, or hypothesis." Air Safety, Inc. v. Roman Catholic Archbishop of Boston, 94 F.3d 1, 4 (1st Cir. 1996) (internal quotations and citations omitted).

To dispel various potential theories of damages, Bedrock cites to Villalobos' and Sears' deposition testimony that they believed Bedrock's pricing was competitive, as well as Villalobos' testimony that he compared Bedrock's pricing to that of other carriers and sometimes used carriers other than those offered by Bedrock. Bedrock also argues that its freight invoices displaying the shipping rate and total amount due for each shipment, and Braintree's multiple internal layers of shipping cost review, were sufficient to alert Braintree to whether Bedrock was overcharging. Thus, Bedrock argues, if the prices it offered to Braintree were not competitive, Braintree had all the information it needed to switch to another logistics provider.

Bedrock misconstrues Villalobos' role in ensuring that Braintree obtained competitive pricing on logistics services. Even crediting Villalobos' testimony that he disputed freight invoices when the rates displayed on those invoices failed to match the rates displayed on

Bedrock's TMS, this process revealed only *carrier* overcharges. It did not reflect whether or not Bedrock's charges for its *logistics* services – which included the confidential sales margins that Bedrock added to the rates it negotiated with carriers before calculating the "discount" from the market rates for those carriers' services displayed to Braintree on the TMS and on freight invoices – were higher, lower, or on par with those of competitor logistics providers. Nor would Braintree's multiple layers of internal review reveal Bedrock's overcharges, as Braintree's review of shipping costs focused only on discrepancies between freight invoices and carrier rates displayed on the TMS. Neither freight invoices nor TMS rates provided an independent baseline for comparing Bedrock's charges for logistics services with those of its competitors.[5]

Additionally, Bedrock argues that there are critical flaws in Braintree's damages calculation, rendering that calculation speculative. Bedrock argues that Braintree's theory of damages using its expert's comparisons of quotes from Bedrock's competitors is not based on sufficient facts and data and is not the product of reliable principles or methods. Bedrock contends further that Braintree's damages model fails to account for factors other than the Villalobos-Sears arrangement that could have affected pricing. For example, Bedrock argues that it might provide better or more services than its competitors.

At this stage, the court need not reach these disputes regarding this theory of damages, because Braintree has provided a solid factual foundation, sufficient to survive summary judgment, that it suffered damages in the form of the *compensation* that it paid to Villalobos to provide services for Braintree while Villalobos was receiving kickbacks from Sears. This theory

---

[5] Braintree makes clear in its Opposition that its claims against Bedrock "have nothing to do with the accuracy of invoices as compared to promised prices. What the record evidence actually shows is that as a result of paying kickbacks to Villalobos, Bedrock was able to charge plaintiffs artificially inflated rates and 'sales margins,' which Bedrock then offered through the TMS system." Braintree's Opp'n to Bedrock's Mot. Summ. J. 13 [#144].

of damages arises out of Villalobos' duty of loyalty to Braintree. "Employees occupying a position of trust and confidence owe a duty of loyalty to their employer and must protect the interests of the employer." <u>Chelsea Indus., Inc. v. Gaffney</u>, 449 N.E.2d 320, 326 (Mass. 1983). For purposes of summary judgment, Bedrock does not dispute that Villalobos owed a duty of loyalty to Braintree. Moreover, viewing the evidence in the light most favorable to Braintree, Villalobos occupied a position of trust and confidence in his role as Braintree's shipping manager, because he had the authority to make decisions about which logistics providers Braintree would use and the responsibility to ensure Braintree received competitive pricing. As such, Villalobos was "bound to act solely for his employer's benefit in all matters within the scope of his employment." <u>Id.</u> at 326.[6]

An employer whose employee has breached his or her duty of loyalty to the employer may recover under two theories of damages resulting from that breach. "If the conduct caused a loss to the employer, it can recover as damages the amount of such loss." <u>Orkin Exterminating Co. v. Rathje</u>, 72 F.3d 206, 207 (1st Cir. 1995). Alternatively, even in the absence of a showing of quantifiable injury caused by the breach of the duty of loyalty, the employer may recover the compensation paid to the employee "during the period of breach." <u>Id.</u>

---

[6] All of Braintree's claims against Bedrock arise out of allegations that Bedrock facilitated a breach of this duty. Count One, for conspiracy, is based on Bedrock's kickbacks to and bribery of Villalobos. Am. Compl. ¶ 26 [#39]. Count Two, for aiding and abetting breach of fiduciary duty, is based on Bedrock's conduct in assisting Villalobos to violate his duty of loyalty to Bedrock. <u>Id.</u> ¶ 34. Count Three, for breach of the duty of good faith and fair dealing, is based on Bedrock "secretly corrupting Mr. Villalobos so as to enable it to charge Braintree and Affordable more for the services than they were worth." <u>Id.</u> ¶ 38. Count Four, for violation of M.G.L. ch. 93A, is once again based on kickbacks to and bribery of Villalobos. <u>Id.</u> ¶ 43. Count Five, for tortious interference, is based on Bedrock's interference with Braintree's contractual relationship with Villalobos "by causing him to act disloyally, in violation of the duties he owed as a Braintree employee." <u>Id.</u> ¶ 51. Thus, as explained *infra*, compensation paid to Villalobos while he was acting other than in Braintree's best interest is a form of damages that Braintree has suffered as a result of the conduct underlying each of Braintree's five claims against Bedrock.

Braintree contends that it has suffered substantial losses as a result of Villalobos' arrangement with Sears and Bedrock, which concealed Bedrock's overcharging for its services. But regardless of whether Braintree's showing on summary judgment as to any such overcharges is subject to challenge, Braintree has raised a genuine dispute about whether it was deprived of at least a portion of the services that it compensated Villalobos to provide. Braintree has shown that it was paying Villalobos, as shipping manager, at least in part to compare Bedrock's pricing for logistics services with those of its competitors, and Villalobos failed to fully carry out these duties. Therefore, Braintree suffered an injury in the form of at least a portion of the compensation it paid to Villalobos during the course of the Sears-Villalobos payment scheme. Braintree's loss of that portion of Villalobos' services is sufficient for Braintree to survive summary judgment on the damages elements of each of Braintree's claims.

   b.  *Whether Bedrock Interfered with Braintree's Contractual Relationships or Prospective Economic Advantage*

Bedrock also seeks summary judgment on Braintree's tortious interference claim. To make out a claim for tortious interference with a contract or business relationship, Braintree is required to show: "(1) the existence of a contract or business relationship which contemplated economic benefit; (2) the defendant['s] knowledge of the contract or business relationship; (3) the defendant['s] intentional interference with the contract or business relationship for an improper purpose or by improper means; and (4) damages." Swanset Dev. Corp. v. City of Taunton, 668 N.E.2d 333, 338 (Mass. 1996).

Bedrock contends that there is no evidence that Bedrock interfered with any of Braintree's relationships with existing shippers. But Braintree rests its tortious interference claim at least in part on Bedrock's alleged intentional interference with the employment contract between Villalobos and Braintree. Count Five of Braintree's Amended Complaint alleges that

"Bedrock intentionally interfered with Braintree's contractual relationship and prospective economic advantage with Mr. Villalobos . . . , by causing him to act disloyally, in violation of the duties he owed as a Braintree employee . . . ." Am. Compl. ¶ 51; see also Braintree's Opp'n to Bedrock's Mot. Summ. J. 18 [#144] ("Bedrock ignores the actual allegations that focused on its intentional interference with the relationship between [Braintree] and Villalobos.").

As described in the previous subsection, there is evidence in the record that Bedrock had knowledge of and even participated in a scheme to provide kickbacks to Villalobos, which influenced Villalobos, in a breach of his duties as Braintree's shipping manager, to continue using Bedrock's logistics services over those of Bedrock's competitors. This is sufficient to permit a rational jury to find for Braintree on Braintree's claim for tortious interference.

For the foregoing reasons, Bedrock's Motion for Summary Judgment on All of Plaintiffs' Claims [#128] is DENIED.

IV.     Villalobos' and Sears' Motions for Summary Judgment on Bedrock's Third-Party Claims

Bedrock brings a contribution claim (Count I) and conspiracy claim (Count III) against both Villalobos and Sears, and a common law indemnity claim (Count II), breach of contract claim (count IV), breach fiduciary duty claim (Count V) and breach of the duty of good faith and fair dealing claim (count VI) against Sears.[7] Each of these claims is conditioned upon Braintree recovering from Bedrock on Braintree's claims in the Amended Complaint [#39]. Third Party Compl. ¶¶ 17, 20 (seeking recovery as to Counts I and II "[t]o the extent that Bedrock is liable to [Braintree] for any tort-based recovery"); id. ¶¶ 24, 28, 33, 38 (seeking recovery as to Counts III through VI "[i]f [Braintree] recover[s] against Bedrock"). Villalobos has filed a Motion for

---

[7] The court previously dismissed Bedrock's common-law indemnity claim against Villalobos. See Memorandum & Order 3-5 [#86].

<u>Summary Judgment</u> [#123] on Bedrock's two remaining claims against him. Sears has filed a

<u>Motion for Summary Judgment</u> [#132] on Bedrock's six claims against him.

a. *Contribution*

Villalobos argues there is no evidence that Villalobos is liable to Braintree for any tort.

Thus, he argues, he is not a joint tortfeasor and Bedrock has no right of contribution against him.

However, as discussed *supra* in the section analyzing Braintree's claims against Bedrock,

Braintree has produced evidence showing Villalobos owed a duty of loyalty to Braintree, that

Bedrock's conduct influenced Villalobos to breach this duty, and that Braintree suffered injuries

as a result of that breach. This raises a genuine dispute of fact as to whether Villalobos has

breached his duty of loyalty to Braintree.

Sears acknowledges that Bedrock's contribution claim against him is based on a

"conspiracy by and between Villalobos and Sears whereby Sears paid money to Villalobos based

on the Plaintiffs' shipping contract with Bedrock . . . ." Sears' Mem. in Supp. Mot. Summ. J. 6

[#133]. He argues that Bedrock had knowledge of the arrangement (a contention discussed

further below), and that although a contribution claim "could survive Bedrock's knowledge,"

"Bedrock eschewing its position that it had no knowledge of the payments to Villalobos would

leave it liable as a joint tortfeasor as to Braintree." <u>Id.</u> at 6 n.2. But that is exactly the point of the

contribution claim – to seek contribution in the event that Bedrock is found liable to Braintree.[8]

Under Massachusetts law, "where two or more persons become jointly liable in tort for

the same injury to person or property, there shall be a right of contribution among them . . . ."

---

[8] Sears also contends that one cannot be liable for both indemnity and contribution, and that because Bedrock has stated that it was an innocent third-party victim of a scheme by Sears and Villalobos, it cannot also seek contribution from Sears and Villalobos. This argument misses the mark. Despite the inconsistency between indemnity and contribution claims, the claims may be pleaded in the alternative. <u>See</u> Fed R. Civ. P. 8(d)(2)-(3).

M.G.L. ch. 231B, § 1(a). "The right of contribution shall exist only in favor of a joint tortfeasor . . . who has paid more than his pro rata share of the common liability . . . ." Id. § 1(b). If a jury finds for Braintree on some or all of its claims against Bedrock, the evidence is sufficient for the jury to conclude that Villalobos, Sears, and Bedrock acted jointly in committing tortious conduct against Braintree. In this scenario, the right of contribution in M.G.L. ch. 231B, § 1, exists to ensure Bedrock is not required to pay more than its *pro rata* share of the common liability simply because Braintree chose to sue only Bedrock. Accordingly, Bedrock's contribution claim against Villalobos and Sears survives summary judgment.

    b. *Conspiracy*

Bedrock's conspiracy claim against Villalobos and Sears is based on a "concerted action" theory of civil conspiracy,[9] under which a person may be liable for civil conspiracy if he "knows that the conduct of another person constitutes a breach of duty and gives substantial assistance or encouragement to the other so to conduct himself." Kurker v. Hill, 689 N.E.2d 833, 837 (Mass. 1998) (internal quotations omitted). Villalobos seeks summary judgment on Bedrock's civil conspiracy claim, arguing there is no evidence he committed any tort *against Bedrock* or that Bedrock suffered any damages as a result of his conduct. Villalobos argues further that the claim is foreclosed as there is evidence that Bedrock knew of the arrangements. Sears similarly argues that the claim is foreclosed because of Bedrock's knowledge.

On Villalobos' motion to dismiss, the court held that "although Bedrock styles its count for civil conspiracy as a standalone cause of action, . . . [t]he . . . claim *primarily* alleges harm to Braintree, rather than Bedrock." Memorandum & Order 4 [#86] (emphasis added). The court

---

[9] Massachusetts law also recognizes a distinct form of civil conspiracy based on coercion, but there is no evidence that Villalobos and Sears had a power of coercion over Bedrock and Bedrock does not argue that they did.

nonetheless allowed the claim to proceed past the motion to dismiss stage "as a standalone cause of action that may provide for different remedies." Id. In opposing Villalobos' Motion for Summary Judgment, Bedrock does not suggest that the claim had any different facets than the alleged harm to Braintree, or that it sought different remedies under the conspiracy claim than the contribution claim. Bedrock argues that liability may be found "because Villalobos and Sears agreed to a payment deal for which Braintree claims Bedrock is liable in tort and Bedrock alleges that Sears and Villalobos are joint tortfeasors with . . . liability for any damages caused to Braintree by their payment deal." Bedrock's Opp'n to Villalobos' Mot. Summ. J. 5 [#142]. But this argument only underscores that Bedrock's civil conspiracy claim is entirely duplicative of its contribution claim.

Nor, as Villalobos argues, can a separate civil conspiracy claim stand in light of the legal standard for such a claim. Although Bedrock may bring contribution claims for harm to Braintree, Bedrock may not bring a conspiracy claim for harm to Braintree. Instead, for a conspiracy claim, Bedrock would need evidence of an agreement to commit a tortious act against Bedrock. See, e.g., Kurker, 689 N.E.2d at 836-37. The summary judgment record includes no such evidence.

Accordingly, to the extent that Bedrock is seeking to recovery based on the alleged harm to Braintree caused by Villalobos and Sears' joint actions, such recovery may be sought under only under the contribution claim rather than as a stand-alone conspiracy claim.[10]

   c.  *Bedrock's Remaining Third Party Claims*

Assessment of Bedrock's remaining third-party claims is aided by dividing the facts of this case into two distinct time periods. First is the period of time from the start of the Sears-

---

[10] The conspiracy claim is also subject to summary judgment based on Bedrock's knowledge, as discussed below.

Villalobos payment scheme in 2012 until Bedrock's termination of McCabe in February 2014. Second is the period of time from McCabe's termination until Braintree's discovery of the Sears-Villalobos payment scheme in August 2016. Prior to Bedrock's termination of McCabe, the evidence is undisputed that Bedrock, through its then-president, McCabe,[11] had knowledge of the Sears-Villalobos payment scheme. After Bedrock's termination of McCabe, however, there is a genuine dispute of fact as to whether Bedrock had any knowledge of the Sears-Villalobos payments.

Bedrock asserts a right of indemnification against Sears. A common law right of indemnification "allows someone who is without fault, compelled by operation of law to defend himself against the wrongful act of another, to recover from the wrongdoer the entire amount of his loss, including reasonable attorney's fees." Ferreira v. Chrysler Grp., LLC, 13 N.E.3d 561, 567 (Mass. 2014) (quoting Elias v. Unisys Corp., 573 N.E.2d 946, 948 (Mass. 1991); see also Decker v. Black & Decker Mfg. Co., 449 N.E.2d 641, 644 (Mass. 1983).[12] "Only in exceptional cases . . . has indemnity been allowed to one who was not free from fault." Rathbun v. Western Mass. Elec. Co., 479 N.E.2d 1383, 1385 (Mass. 1985). In such cases, "the indemnitee's

---

[11] Massachusetts law provides that "the acts and intent of natural persons, be they officers, directors, or employees, can be treated as the acts and intent of the corporation itself," Platten v. HG Bermuda Exempted Ltd., 437 F.3d 118, 130 (1st Cir. 2006) (quoting Commonwealth v. Beneficial Fin. Co., 275 N.E.2d 33, 77 (Mass. 1971)), so long as the natural person in question has "been vested with the authority to act on behalf of the corporation in the sphere of corporate business in which he commits the [alleged wrongful] act," id. (quoting Beneficial Fin., 275 N.E.2d at 80). It is undisputed that McCabe, as Bedrock's president, knew of and, at minimum, implicitly sanctioned the kickback payment scheme between Sears and Villalobos. Therefore, McCabe's conduct can be treated as "the acts and intent" of Bedrock itself. Id.

[12] Indemnification may also arise through express agreement or through a contractual right "implied from the nature of the relationship between the parties," see Araujo v. Woods Hole, Martha's Vineyard, Nantucket S.S. Authority, 693 F.2d 1, 2 (1st Cir. 1982), but Bedrock has neither pleaded these grounds for indemnity nor set forth any facts from which a reasonable jury could find that such grounds for indemnity existed between Bedrock and Sears.

negligence has been insignificant in relation to that of the indemnitor." Id. Thus, whereas a right of contribution addresses the need for apportionment of damages among joint tortfeasors, the common law doctrine of indemnity addresses the distinct need to permit a blameless party, "held derivately or vicariously liable for the wrongful conduct of another," Ferreira, 13 N.E.3d at 567, to be reimbursed for damages paid by that party as a result of the wrongful conduct of another. Elias, 573 N.E.2d at 948.

The undisputed evidence in the record shows that while McCabe was Bedrock's president, Bedrock was involved with Sears and Villalobos in the Sears-Villalobos payment scheme on which Braintree bases its tort claims against Bedrock. As to this period, because Bedrock had knowledge of the scheme, it was at least responsible for some of the wrongful conduct that Braintree alleges, and therefore is defending its own not insignificant misfeasance. This same logic applies to the second time period if a jury were to find that Bedrock had knowledge of the scheme during that period. And if a jury were to find that Bedrock did not have such knowledge after February 2014, there is no theory on which Bedrock would be liable to Braintree for the Sears-Villalobos payments during that period and Bedrock would not have a right of (or need for) indemnification against Sears. Thus, Bedrock's indemnity claim fails.

All of Bedrock's remaining claims – the breach of contract, breach of the implied covenant of good faith and fair dealing, and breach of fiduciary duty claims against Sears – (as well as the conspiracy claim discussed above) are also conditioned upon Bedrock being held liable to Braintree on Braintree's claims. Bedrock does not dispute that, if Bedrock had knowledge of the Sears-Villalobos payment scheme, Sears and Villalobos cannot be liable to Bedrock on these claims. Instead, Bedrock counters that a genuine dispute of material fact remains regarding whether Bedrock knew of the Sears-Villalobos payments.

Each of the claims at issue requires Bedrock to show that Sears breached, or assisted another in breaching, some duty owed to Bedrock. Where the undisputed evidence is that, prior to Bedrock's termination of McCabe, Bedrock knowingly profited from Sears' kickbacks to Villalobos, nothing in the record shows that Sears' conduct was contrary to what Bedrock was paying him to do. Indeed, Sears' kickbacks to Villalobos appear to have been a means of carrying out his agreement with Bedrock to solicit Braintree's business. Therefore, during the first relevant period, Bedrock was a participant in the Sears-Villalobos payment scheme, and it cannot sustain these four causes of action for conduct occurring during that period.

As for the period following McCabe's termination, Bedrock is correct that a genuine dispute of fact remains about whether Bedrock was aware of the Sears-Villalobos payments. This dispute is not material, however. Regardless of whether a jury finds that Bedrock had knowledge of the scheme, Bedrock's claims fail. If a jury finds Bedrock had knowledge of the Sears-Villalobos payment scheme from February 2014 until August 2016, then Bedrock was a participant in that scheme and for that reason cannot sustain these four claims against Sears. If a jury finds Bedrock had no knowledge of the scheme during the period from February 2014 until August 2016, Bedrock cannot be held liable *to Braintree* for that period of time. Thus, Bedrock's conspiracy, breach of contract, breach of good faith and fair dealing, and breach of fiduciary duty claims, all premised solely on Bedrock being held liable to Braintree, must fail.

Accordingly, Villalobos' Motion for Summary Judgment [#123] is denied as to Count I (contribution) and allowed as to Count III (conspiracy). Sears' Motion for Summary Judgment [#132] is denied as to Count I (contribution) but allowed as to Counts II (indemnity), III (conspiracy), IV (breach of contract), V (breach of fiduciary duty), and VI (breach of duty of good faith and fair dealing).

V.    Bedrock's Motion for Summary Judgment on All of James Sears' Third-Party Claims

Sears brought third-party counterclaims against Bedrock for breach of contract (Count I), breach of the implied warranty of good faith and fair dealing (Count II), and violations of M.G.L. ch. 93A § 11 (Count III). Bedrock has filed a Motion for Summary Judgment [#130] as to all three counts.

Sears asserts that he had a relationship with Braintree that predated Bedrock's involvement and an arrangement with Bedrock whereby Bedrock would pay Sears a commission for each Braintree shipment ordered through Bedrock, resulting in Sears obtaining substantial commission income through his and Bedrock's relationship with Braintree. He contends that if Braintree proves Bedrock overcharged Braintree, then Bedrock alone is to blame for Braintree's termination of Bedrock's services, and the loss of his commissions. Sears asserts that "the present motion appears to be little more than a redux of [Bedrock's] failed motion to dismiss," and he argues that, "[i]f it is proved that Bedrock overbilled [Braintree], and not on account of any actions or omissions alleged as against Sears, then Sears has lost the benefits of that contract through no fault of his own." Sears' Opp'n to Bedrock's Mot. Summ. J. 4 [#151].

On summary judgment, however, Sears was required to come forward with facts to support his legal claims. Sears' Opposition to Bedrock's Motion for Summary Judgment [#151], which simply repeats his pleadings, is devoid of factual support for the above scenario. Braintree's Amended Complaint asserted harm caused by *both* the kickback payments and Bedrock's billing. Following discovery, the record is undisputed that no one at Braintree other than Villalobos knew of the kickback payments, and that Braintree severed the relationship with Bedrock on account of *both* the kickback payments and its belief that Bedrock was fraudulently billing Braintree. Notably, despite Villalobos' assertions that Bedrock had not overbilled, the

record shows that Braintree nonetheless terminated Villalobos' employment as soon as he admitted that he was receiving payments from Sears. Bedrock's Resps. to Braintree's Add'l SOF ¶ 35 [#158]. Sears offers no evidence to support the suggestion that Braintree would have continued working with Sears despite his payments to Villalobos if not for Bedrock's overbilling.

On this record, there is thus no evidence to support Sears' claim against Bedrock for breach of contract or breach of the duty of good faith and fair dealing. Instead, it appears Sears' claims are an attempt to read additional terms into his agreement with Bedrock regarding Sears' right to continue his relationship with Braintree, regardless of his own actions. The covenant of good faith and fair dealing "does not supply terms that the parties were free to negotiate, but did not, nor does it 'create rights and duties not otherwise provided' for in the contract." Chokel v. Genzyme Corp., 867 N.E.2d 325, 329 (Mass. 2007) (quoting Ayash v. Dana-Farber Cancer Inst., 822 N.E.2d 667, 684 (Mass. 2005)) (citations omitted). There is no evidence from which a jury could find that Sears' agreement with Bedrock guaranteed Sears continued commissions from Braintree after Braintree discovered Sears was engaged in a kickback scheme to secure Braintree's business.

Finally, Sears has failed to produce any evidence to support his M.G.L. ch. 93A § 11 "unfair or deceptive act or practice" claim. Sears claims that the unfair or deceptive act or practice at issue is Bedrock's alleged fraudulent billing. According to Sears, this act or practice caused him to lose the commissions he received for each Braintree shipment. But Sears cannot show that Bedrock's alleged fraudulent billing harmed him where the undisputed record is that Braintree stopped using Sears and Bedrock at least in part because of the payments Sears was making to Braintree's employee. Further, to determine whether an act or practice is unfair or

deceptive, a court must balance "the equities in the relationship of the parties," which "requires an examination of the knowledge and bargaining power of the plaintiff, as well as the plaintiff's own conduct and what it reasonably should have known." Lily Transp. Corp. v. Royal Inst'l Servs., Inc., 832 N.E.2d 666, 689 (Mass. App. 2005) (internal citations and quotations omitted). Here, Sears' *own conduct* in carrying out the kickback payment scheme negates the essential "causation" element of his M.G.L. ch. 93A claim. Cf. Mass. Farm Bureau Fed'n, Inc. v. Blue Cross of Mass., Inc., 532 N.E.2d 660, 665 (Mass. 1989).

Accordingly, Bedrock has shown that it is entitled to summary judgment on all three third-party counterclaims that Sears has asserted against Bedrock.

VI.     Conclusion

For the foregoing reasons, Bedrock's Motion for Summary Judgment on All of Plaintiffs' Claims [#128] is DENIED, Villalobos' Motion for Summary Judgment [#123] is ALLOWED in part and DENIED in part, Sears' Motion for Summary Judgment on Bedrock's Third-Party Claims [#132] is ALLOWED in part and DENIED in part, and Bedrock's Motion for Summary Judgment on All of James Sears' Claims [#130] is ALLOWED. Further, Bedrock's Motion to Strike the Declaration of David M. Bovet [#155] and Bedrock's Motion to Strike Portions of the Declaration of Philip Rakhunov [#154] are DENIED as moot.

IT IS SO ORDERED.

August 28, 2018                                        /s/ Indira Talwani
                                                        United States District Judge